**Sealed**
Public and unofficial staff access
to this instrument are
prohibited by court order

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

United States Courts
Southern District of Texas
FILED
*June 04, 2026*
Nathan Ochsner, Clerk of Court

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Criminal No. 4:26-cr-343** |
| | § | **UNDER SEAL** |
| **PRINCEPAUL AGBONLAHOR,** | § | |
| **GINGER RUFFIN,** | § | |
| **NEKEWON KONAH,** | § | |
| **STEPHANIE HARRIS, and** | § | |
| **TAKIYA CARADINE** | § | |
| | § | |
| **Defendants.** | § | |

## INDICTMENT

The Grand Jury charges:

## General Allegations

At all times material to this Indictment, unless otherwise specified:

### The Medicaid Program

1.    The Medicaid Program ("Medicaid") was a state-administered health insurance program funded by the United States Government and by the State of Texas.  Medicaid helped pay for reasonable and necessary medical procedures and services provided by qualified healthcare professionals to individuals who were deemed eligible under state low-income programs.  Medicaid was implemented in 1967 under the provisions of Title 19 of the Social Security Act of 1965.  Individuals receiving benefits under Medicaid were referred to as Medicaid "clients."  The Texas Health and Human Services Commission ("HHSC") administered Medicaid in Texas.

2.    Medicaid was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

1

3. The State of Texas contracted with Texas Medicaid and Healthcare Partnership ("TMHP") to administer Texas Medicaid on behalf of Texas HHSC.

4. Texas HHSC contracted with Managed Care Organizations ("MCOs"), including Texas Children's Health Plan, Community Health Choice, Wellcare, Wellpoint, and others, to administer health insurance plans to Medicaid clients.

5. In order to receive reimbursement from Medicaid, a provider applied to TMHP to become an approved Medicaid provider. If the provider met certain minimum qualifications, TMHP approved the application, entered into a written contract with the provider, and issued the provider a unique identification number also known as a "provider number." TMHP-enrolled providers could contract with MCOs to provide medical services to Medicaid clients. The provider was then allowed to submit bills for services, known as "claims," to TMHP or MCOs for reimbursement for the cost of providing medically necessary services to Medicaid clients.

6. By signing a contract with Medicaid, a provider agreed to abide by the policies and procedures of the Medicaid program. Medicaid regulations required that a provider document every service rendered to a client for whom a claim was submitted. This documentation is part of the client's medical record and is required to be retained by the provider for a period of not less than five years.

7. Upon assignment of a Medicaid provider number, a current Texas Medicaid Provider Procedures Manual was distributed to the provider. Updates to the procedures manual were included in Texas Medicaid Bulletins, which were distributed to the provider by TMHP and available online. The procedures manual, bulletins, and updates detailed the rules and regulations pertaining to services covered by Medicaid and how to appropriately bill for services provided to clients.

8.      In Texas, a Qualified Mental Health Professional (QMHP) was a credentialed staff member who provided mental health services (such as targeted case management and rehabilitative services) under the state Medicaid program.

9.      Medicaid covered mental health rehabilitative services for adults and children. Mental health rehabilitative services were defined as providing assistance in maintaining or improving functioning and achieving a rehabilitation goal as defined in their plan of care. Mental health rehabilitative services were provided to individuals with a serious mental illnesses (SMI), as defined in the latest edition of the American Psychiatric Association's (APA's) Diagnostic and Statistical Manual of Mental Disorders (DSM). Mental health rehabilitative services were age-appropriate, individualized, and designed to ameliorate functional impairments that negatively affected any of the following: community integration, community tenure, and/or behaviors resulting from SMI or severe emotional disturbance (SED) that interfered with a person's ability to remain in the community as a fully integrated and functioning member of that community.

10.      Mental health rehabilitative services included medication training and support services, psychosocial rehabilitative services, skills training and development, crisis intervention services, and/or day programs for acute needs.

11.      A Medicaid provider could only bill for medically necessary mental health rehabilitative services that are provided to a Medicaid-eligible person; the legally authorized representative (LAR) of a Medicaid-eligible person who is 21 years of age and older; or the LAR or primary caregiver of a Medicaid-eligible person who is 20 years of age and younger.

12.      A mental health rehabilitative services Medicaid provider was required to ensure that at minimum an individual with a QMHP certification administered an assessment to the Medicaid client at specified intervals (every 90 calendar days for persons who are 20 years of age

3

and younger and every 180 calendar days for persons who are 21 years of age and older) and obtained a recommended level of care ("LOC") for the Medicaid client. The provider must evaluate the clinical needs of the Medicaid client to determine if the number of services associated with the recommended LOC described in the utilization management guidelines was sufficient to meet those needs. The provider must also have ensured that a Licensed Practitioner of the Healing Arts[1] ("LPHA") gave a diagnosis, reviewed the recommended LOC, and verified whether the services were medically necessary. The LPHA determination of diagnosis should have included an interview with the person conducted either in person or via telemedicine or telehealth.

13.    The American Medical Association's Current Procedural Terminology ("CPT") codes were uniform, five-digit codes that were used to report medical procedures and services to health insurance entities, including Medicaid and MCOs.  In the context of billing Medicaid, CPT codes described the kind of procedure(s) a client received from a provider.

14.    A Medicaid claim was required to set forth, among other things, the client's name and Medicaid identification number, the services performed for the client, the date the services were provided, the cost of the services, and the name and identification number of the healthcare provider who rendered the services.  Upon submitting a claim to Medicaid, a provider certified, among other things, that:

   a.    The information submitted regarding claims or encounter data was true, accurate, and complete; and

   b.    The claim or encounter data submitted was prepared in compliance with the laws and regulations governing Medicaid.

---

[1] This included an individual possessing any of the following licenses: physician, physician assistant, nurse practitioner, psychologist, licensed clinical social worker, licensed marriage and family therapist, and licensed professional counselor.

**<u>The Defendants and Relevant Individuals</u>**

15.    Lahor Behavioral Services, LLC ("Lahor") was mental health services clinic and Medicaid provider located at 14526 Old Katy Road, Suite 200, Houston, Texas 77079.

16.    Defendant PRINCEPAUL AGBONLAHOR ("**AGBONLAHOR**"), a resident of Harris County, Texas, was the owner and operator of Lahor.

17.    Defendant GINGER RUFFIN ("**RUFFIN**"), a resident of Montgomery County, Texas, was a QMHP, a supervisor of the QMHPs, and employed by Lahor to provide mental health services.

18.    Defendant NEKEWON KONAH ("**KONAH**"), a resident of Harris County, Texas, was a QMHP and employed by Lahor to provide mental health services.

19.    Defendant STEPHANIE HARRIS ("**HARRIS**"), a resident of Brazoria County, Texas, was a QMHP and employed by Lahor to provide mental health services.

20.    Defendant TAKIYA CARADINE ("**CARADINE**"), a resident of Harris County, Texas, was a QMHP and employed by Lahor to provide mental health services.

**<u>The Fraudulent Scheme</u>**

*Overview of the Scheme*

21.    Defendants **AGBONLAHOR**, **RUFFIN**, **KONAH**, **HARRIS**, **CARADINE**, and their co-conspirators engaged in a scheme and artifice to defraud Medicaid by submitting and causing to be submitted false and fraudulent claims for mental health services that were not provided and/or were not overseen by a licensed LPHA.  Over the course of the scheme, which began no later than 2020, and continued through 2026, Medicaid was billed more than $16 million and paid over $8 million for mental health services purportedly provided by **RUFFIN**, **KONAH**, **HARRIS**, **CARADINE**, and other counselors at Lahor. Many of these services were not provided

at all.

*Purpose of the Scheme*

22.     It was a purpose of the scheme for defendants **AGBONLAHOR**, **RUFFIN**, **KONAH**, **HARRIS**, **CARADINE**, and their co-conspirators to unlawfully enrich themselves by, among other things: (1) submitting and causing to be submitted false and fraudulent claims to Medicaid for services that were not provided; and (2) diverting the proceeds of the fraud for their personal use and benefit, and the personal use and benefit of their co-conspirators, in the form of compensation, disbursements, and other remuneration.

*Manner and Means of the Scheme*

23.     **AGBONLAHOR** maintained a Medicaid provider number for Lahor which **AGBONLAHOR** used to submit and caused to be submitted claims to Medicaid and MCOs for mental health services that were not provided and/or were not overseen by a licensed LPHA.

24.     **AGBONLAHOR**, and others, known and unknown to the Grand Jury, marketed Lahor to a patient population consisting primarily of non-English speaking and/or low-income pediatric Medicaid clients suffering from serious mental health illnesses. **AGBONLAHOR, RUFFIN, KONAH**, **HARRIS**, **CARADINE,** and others known and unknown to the Grand Jury, convinced caregivers of this patient population to enroll their children with Lahor for mental health services.

25.     **AGBONLAHOR**, without regard as to whether services were actually provided to Medicaid clients, instructed Lahor counselors, including **RUFFIN**, **KONAH**, **HARRIS**, and **CARADINE**, to bill Medicaid in two-hour increments for billing code H2014, skills training and development, and weekly for 1 hour for billing code T1017, targeted case management. Despite the fact that billing codes H2014 and T1017 can be billed in 15-minute increments, Lahor

submitted over 7,000 individual claims for code H2014 purportedly lasting 2 hours of services, over 700 individual claims for code T1017 purportedly lasting an hour of services, and over that 700 individual claims for code T1017 purportedly lasting two hours of services.

26.   At times during the conspiracy, with the knowledge and direction of **AGBONLAHOR**, Lahor operated without a Medicaid-required LPHA to assess Medicaid clients with a diagnosis, review their LOC, and verify whether the mental health services were medically necessary.

27.   At **AGBONLAHOR**'s and **RUFFIN**'s direction, **RUFFIN**, **KONAH**, **HARRIS**, **CARADINE,** and others known and unknown to the Grand Jury, despite knowing that mental health services were not provided, falsified entries in patient records to make it appear as though the services had been rendered.  **AGBONLAHOR**, and others known and unknown to the Grand Jury, directed billing staff to submit false claims to Medicaid as though mental health services had been rendered when in reality they had not.

28.   At **AGBONLAHOR**'s and **RUFFIN**'s direction, **RUFFIN**, **KONAH**, **HARRIS**, **CARADINE,** and others known and unknown to the Grand Jury, despite knowing that mental health services were not provided, also falsified employee timesheets to cover up the fraudulent billing to Medicaid for mental health services that had not been provided and personally enrich themselves for services that were not actually provided.

29.   From in or around 2020 to in or around 2026, **AGBONLAHOR**, **RUFFIN**, **KONAH**, **HARRIS**, **CARADINE**, and others, known and unknown to the Grand Jury, submitted or caused the submission of approximately $16 million in claims to Medicaid and MCOs for mental health services purportedly performed by **RUFFIN**, **KONAH**, **HARRIS**, **CARADINE**, and other counselors at Lahor, many of which were not provided at all.  Medicaid and MCOs paid

7

approximately $8 million on those claims.

## COUNT ONE
### Conspiracy to Commit Healthcare Fraud
### (18 U.S.C. § 1349)

30.     The allegations in paragraphs 1 through 29 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

31.     Beginning in or around 2020, and continuing through in or around 2026, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and elsewhere, the defendants,

**PRINCEPAUL AGBONLAHOR,**
**GINGER RUFFIN,**
**NEKEWON KONAH,**
**STEPHANIE HARRIS,** and
**TAKIYA CARADINE**

did knowingly and willfully combine, conspire, confederate, and agree with each other and with others, known and unknown to the Grand Jury, to commit certain offenses against the United States, namely to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), specifically Medicaid and its MCOs, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

### Purpose of the Conspiracy

32.     The object and purpose of the conspiracy are described in paragraph 22 of this Indictment, and are realleged and incorporated by reference as though fully set forth herein.

### Manner and Means of the Conspiracy

8

33.     In furtherance of the conspiracy and to accomplish its object and purpose, the manners and means that were used are described in paragraphs 21 through 29 of this Indictment, and are realleged and incorporated by reference as though fully set forth herein.

All in violation of Title 18, United States Code, Section 1349.

**COUNTS 2-18**
**Health Care Fraud**
**(18 U.S.C. §§ 1347 and 2)**

34.     Paragraphs 1 through 29 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

35.     Beginning in or around 2020 and continuing through in or around 2026, in the Houston Division of the Southern District of Texas and elsewhere, in connection with the delivery of, and payment for, health care benefits, items, and services, the Defendants did knowingly and willfully execute, and attempt to execute, the aforementioned scheme and artifice to defraud, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of a health care benefit program as defined in 18 U.S.C. § 24(b), that is, Medicaid.

36.     On or about the dates specified below, in the Houston Division of the Southern District of Texas and elsewhere, the Defendants specified below, aiding and abetting and aided and abetted by each other and others known and unknown to the Grand Jury, submitted or caused to be submitted the following false and fraudulent claims to the aforementioned health care benefit programs, for mental health services that were often not provided, in an attempt to execute, and in execution of the aforementioned scheme, as described in paragraphs 21 through 29, with each execution set forth below forming a separate count:

9

| Count | Defendants Charged | Date of Service | Patient | Approx. Amount Billed | Approx. Amount Paid |
|---|---|---|---|---|---|
| 2 | AGBONLAHOR, RUFFIN | 3/22/2026 | D.Z. | $280.00 | $200.16 |
| 3 | AGBONLAHOR, RUFFIN | 3/30/2026 | D.Z. | $280.00 | $200.16 |
| 4 | AGBONLAHOR, RUFFIN | 1/1/2026 | J.J. | $280.00 | $200.16 |
| 5 | AGBONLAHOR, RUFFIN | 1/12/2026 | J.J. | $400.00 | $96.28 |
| 6 | AGBONLAHOR, KONAH | 1/18/2026 | S.M | $280.00 | $200.16 |
| 7 | AGBONLAHOR, KONAH | 1/20/2026 | S.M | $280.00 | $200.16 |
| 8 | AGBONLAHOR, KONAH | 10/27/2025 | K.S. | $280.00 | $200.16 |
| 9 | AGBONLAHOR, KONAH | 10/30/2025 | K.S. | $280.00 | $200.16 |
| 10 | AGBONLAHOR, HARRIS | 1/6/2026 | T.S. | $280.00 | $200.16 |
| 11 | AGBONLAHOR, HARRIS | 1/10/2026 | T.S. | $280.00 | $200.16 |
| 12 | AGBONLAHOR, HARRIS | 10/7/2025 | G.C. | $280.00 | $200.16 |
| 13 | AGBONLAHOR, HARRIS | 12/19/2025 | G.C. | $280.00 | $200.16 |

| Count | Defendants Charged | Date of Service | Patient | Approx. Amount Billed | Approx. Amount Paid |
|---|---|---|---|---|---|
| 14 | AGBONLAHOR, CARADINE | 1/2/2026 | S.R. | $280.00 | $200.16 |
| 15 | AGBONLAHOR, CARADINE | 1/5/2026 | S.R. | $280.00 | $200.16 |
| 16 | AGBONLAHOR, CARADINE | 1/1/2026 | I.O. | $280.00 | $200.16 |
| 17 | AGBONLAHOR, CARADINE | 1/1/2026 | D.O. | $280.00 | $200.16 |
| 18 | AGBONLAHOR, CARADINE | 1/1/2026 | S.O. | $280.00 | $200.16 |

**COUNTS 19-35**

**False Statements Relating to Health Care Matters**
**(18 U.S.C. §§ 1035 and 2)**

37.     Paragraphs 1 through 29 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

38.     On or about the dates set forth below, in the Houston Division of the Southern District of Texas, the Defendants specified below, aiding and abetting and aided and abetted by each other and others known and unknown to the Grand Jury, did knowingly and willfully make materially false writings and documents, as set forth below, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services, and in a matter involving a health care benefit program, specifically Medicaid and its MCOs:

11

| Count | Defendant Charged | Date | Patient | Description | Nature of Falsity |
|---|---|---|---|---|---|
| 19 | **RUFFIN** | 3/22/2026 | D.Z. | False Visit Note | Visit had not occurred as documented |
| 20 | **RUFFIN** | 3/30/2026 | D.Z. | False Visit Note | Visit had not occurred as documented |
| 21 | **RUFFIN** | 1/1/2026 | J.J. | False Visit Note | Visit had not occurred as documented |
| 22 | **RUFFIN** | 1/12/2026 | J.J. | False Visit Note | Visit had not occurred as documented |
| 23 | **KONAH** | 1/18/2026 | S.M | False Visit Note | Visit had not occurred as documented |
| 24 | **KONAH** | 1/20/2026 | S.M | False Visit Note | Visit had not occurred as documented |
| 25 | **KONAH** | 10/27/2025 | K.S. | False Visit Note | Visit had not occurred as documented |
| 26 | **KONAH** | 10/30/2025 | K.S. | False Visit Note | Visit had not occurred as documented |
| 27 | **HARRIS** | 1/6/2026 | T.S. | False Visit Note | Visit had not occurred as documented |
| 28 | **HARRIS** | 1/10/2026 | T.S. | False Visit Note | Visit had not occurred as documented |
| 29 | **HARRIS** | 10/7/2025 | G.C. | False Visit Note | Visit had not occurred as documented |
| 30 | **HARRIS** | 12/19/2025 | G.C. | False Visit Note | Visit had not occurred as documented |
| 31 | **CARADINE** | 1/2/2026 | S.R. | False Visit Note | Visit had not occurred as documented |
| 32 | **CARADINE** | 1/5/2026 | S.R. | False Visit Note | Visit had not occurred as documented |
| 33 | **CARADINE** | 1/1/2026 | I.O. | False Visit Note | Visit had not occurred as documented |
| 34 | **CARADINE** | 1/1/2026 | D.O. | False Visit Note | Visit had not occurred as documented |
| 35 | **CARADINE** | 1/1/2026 | S.O. | False Visit Note | Visit had not occurred as documented |

In violation of Title 18, United States Code, Sections 1035 and 2.

**NOTICE OF CRIMINAL FORFEITURE**
**(18 U.S.C. § 982(a)(7))**

39.     Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to defendants **PRINCEPAUL AGBONLAHOR, GINGER RUFFIN,**

12

**NEKEWON KONAH, STEPHANIE HARRIS,** and **TAKIYA CARADINE**, that, upon conviction of Counts One through Thirty-Five, all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offenses is subject to forfeiture.

**Money Judgment and Substitute Assets**

Defendants **PRINCEPAUL AGBONLAHOR, GINGER RUFFIN, NEKEWON KONAH, STEPHANIE HARRIS,** and **TAKIYA CARADINE** are notified that upon conviction, a money judgment may be imposed against each defendant. In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of each defendant up to the amount of the money judgment.

A TRUE BILL

ORIGINAL SIGNATURE ON FILE

_____
FOREPERSON

JOHN G.E. MARCK
ACTING UNITED STATES ATTORNEY

*Kathryn Olson*

_____
KATHRYN OLSON
ASSISTANT UNITED STATES ATTORNEY
U.S. ATTORNEY'S OFFICE FOR
THE SOUTHERN DISTRICT OF TEXAS